UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **LAKIA HARRIS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | Case No. 06-CV-0676-CVE-SAJ |
| ) | |
| **CROSSHAVEN PROPERTIES, INC.,** ) | |
| ) | |
| ) | |
| **Defendant.** ) | |

## OPINION AND ORDER

Now before the Court is Defendant, Crosshaven Properties, Inc.'s, Motion for Summary Judgment (Dkt. # 30). Plaintiff Lakia Harris ("Harris") filed a complaint (Dkt. # 2) on December 15, 2006, alleging that defendant Crosshaven Properties, Inc. ("Crosshaven") discriminated against her because of her race, African-American, terminated her in retaliation for her complaint about racial discrimination, and failed to remedy her racially hostile work environment, all in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et. seq. ("Title VII"). Crosshaven now moves for summary judgment. Harris has abandoned all of her claims except retaliation. Dkt. # 34, at 9. Crosshaven argues that even if Harris has established a prima facie case, Harris still has failed to provide any evidence that Crosshaven's proffered legitimate, nondiscriminatory reason for her termination is pretextual. For the reasons set forth below, the Court finds that defendant's motion should be **granted**.

**I.**

On or about March 31, 2004, Crosshaven, a small property management company, hired Harris as an assistant manager at its Sunset Plaza Apartments. See Dkt. # 30, at 1-2. Harris had no prior managerial experience before she became assistant manager. Id. at 2. In August 2004, after approximately six months of employment, Harris received a favorable performance evaluation. Id. at 5. Harris mostly met Crosshaven's performance standards. Dkt. # 30-4, at 1. The evaluation noted her "good people skills" and rewarded her with a $1.00/hour raise and a $200/month rent concession. Id. In December 2004, Harris initiated contact with the Equal Employment Opportunity Commission ("EEOC") about discrimination occurring in her workplace.[1] Id. at 5. Harris did not inform Crosshaven about her contact with the EEOC. See Dkt. # 30-7, at 6, 16; Dkt. # 30-12, at 8.

Sometime between March 15 and 16, 2005, the president and sole shareholder of Crosshaven, Scott Gardner ("Gardner"), received a letter from Harris. Dkt. # 34-4, at 2-3, 6. The letter summarized "issues" that Harris believed deserved Gardner's "immediate attention." Dkt. # 34-3, at 1. Among the "problems" listed, Harris claimed that her manager, Cathy Hughes ("Hughes"), spoke to her and the other African-American employee "without dignity and respect." Id. She claimed that Hughes "ma[de] it blatantly obvious her disdain is based on race because she [] never spoke[] in this manner to white employees." Id. Harris claimed that Hughes stated at some point, "I'm not afraid of you. I'll take you on. I'll fight the both of you." Id. (internal quotation marks omitted). Harris also complained of Hughes' alleged "racist comments," which included referring to an African-American tenant as a "crack head," calling two young African-Americans

---

[1]  Harris actually contacted the Oklahoma Human Rights Commission and later contacted the EEOC. Dkt. # 30-5, at 8; Dkt. # 30-7, at 6. For the purpose of this opinion, the Court simply refers to both agencies as the EEOC.

2

"boys," and commenting that the two young men might be "gangbangers." Id. (internal quotation marks omitted). Harris claimed that Hughes "discontinued the services of all black contractors that did better work than all white contractors currently being used at higher rates." Id. Harris further claimed that "[a]lmost on a daily basis, [Hughes] threaten[ed] [her] and the other African American employee with write-ups and terminations without merit." Id. Harris alleged that Hughes accused her of doing substandard work and prevented her from fully performing her duties. Id. Harris concluded, "I hope that this letter has given you a clear picture of the racially hostile work environment that I have been forced to work in." Id. Gardner testified that he did not speak with Harris about her letter. Dkt. # 34-4, at 6.

Gardner claims he did discuss Harris' letter with Hughes, however, and created a memo to document this conversation. Id. at 6-7; see Dkt. # 30-16, at 1. According to Gardner, Hughes denied all of Harris' allegations except that "she may have referred to the [African-American] men as boys simply because they were just that." Dkt. # 30-16, at 1. Hughes told Gardner that "every time she tried to speak with [Harris] regarding any type of clerical issue," Harris became "very defensive." Id. (internal quotation marks omitted). Gardner suggested that "it might be wise to allow [Harris] to go to another property . . . ." Id. Gardner claims that he told Hughes that "she needed to sit down with [Harris] and have a conversation about the fact that we are all trying to get the work done and that we needed to work out whatever issues there may be." Id. at 2.

Gardner claims that, on March 28, 2005, Hughes reported to him that Harris called her a liar in front of a tenant and the tenant's father. Dkt. # 34-5, at 1. Harris admits that a verbal exchange between Hughes and her occurred, but Harris denies calling Hughes a liar. Harris testified,

3

> I asked [the tenant] if he made a statement to [Hughes], because [Hughes] told me he made a statement, so I asked [the tenant] about it in [Hughes'] presence because [Hughes and I] were trying . . . to have a better relationship. And [the tenant] denied it, and I stated that I would appreciate [if] any comments, any lies, concerning me would stop.

Dkt. # 34-2, at 7-8. Gardner testified that he felt, prior to this incident, that Harris had a "bit of an attitude" sometimes. Dkt. # 35-2, at 3. Gardner did not document these instances, however. Id.

The following day, March 29, 2005, Gardner spoke to Harris and told her that he thought her "comments" to Hughes "were insubordinate, inappropriate and rude." Dkt. # 34-2, at 6-7; Dkt. # 34-5, at 1. Gardner claims that because Harris' comments violated company policy, he decided to terminate Harris' employment. Dkt. # 30, at 11. The Crosshaven Rules of Conduct prohibit insubordination, misconduct toward and abuse of fellow employees, and commission of acts affecting the efficiency and productivity of other employees. Dkt. # 30-17, at 1-2. The policy provides that "[e]mployees violating the Rules of Conduct will face disciplinary action up to discharge from employment." Id. at 2.

Gardner claims that after he informed Harris of her discharge, she "told [him] that she had documented what [Hughes] had said to her and that [Gardner] needed to know that for [his] own good." Dkt. # 34-5, at 1. Gardner directed Hughes to prepare a written statement documenting the incident. Dkt. # 30-14, at 1; Dkt. # 34-4, at 11. Gardner also requested that Crista Burnett ("Burnett"), a temporary employee who allegedly witnessed the verbal exchange, give a written statement. Dkt. # 30, at 12; Dkt. # 30-15, at 1. Gardner did not ask the other three witnesses – Harris, the tenant, and the tenant's father – to give written statements, however. Dkt. # 34-4, at 13. In her affidavit, Harris avers that Burnett did not witness the verbal exchange. Dkt. # 34-9, at 1.

Harris filed a formal charge of discrimination with the EEOC on April 29, 2005. Dkt. # 30, at 5. The parties do not dispute that Gardner did not know about the EEOC investigation until after he terminated Harris.[2] See id.; Dkt. # 30-12, at 8. Crosshaven moves for summary judgment on Harris' retaliation claim.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the

---

[2] Harris does not allege that Hughes knew about the EEOC investigation prior to Harris' termination.

5

plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

### III.

Title VII makes it unlawful for an employer to retaliate against an employee because "she has 'opposed' any practice made unlawful by Title VII, or because she has 'participated . . . in an investigation, proceeding, or hearing under this subchapter.'" Stover v. Martinez, 382 F.3d 1064, 1070 (10th Cir. 2004) (quoting 42 U.S.C. § 2000e-3(a)). If an employee has no direct evidence of retaliation, she must prove her claim using the McDonnell Douglas burden-shifting framework. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973); see Stover, 382 F.3d at 1070; Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1225 (10th Cir. 2000). Under this framework, the employee first must establish a prima facie case of retaliation. McDonnell Douglas, 411 U.S. at 802. Once the employee presents a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment decision. Id. at 803; Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 255 (1981); English v. Colorado Dep't of Corrs., 248 F.3d 1002, 1009 (10th Cir. 2001). If the employer makes this showing, the burden shifts back to the employee to show that the employer's stated nondiscriminatory reason is mere pretext for discriminatory animus. Jencks v. Modern Woodmen of Am., 479 F.3d 1261, 1267 (10th Cir. 2007).

**A. Prima Facie Case**

Plaintiff establishes a prima facie case of retaliation by showing that: (1) she engaged in protected opposition about which the employer knew; (2) she suffered an adverse employment action; and (3) a causal connection exists between the protected opposition and the adverse employment action. Stover, 382 F.3d at 1071; Hertz v. Luzenac Am., Inc., 370 F.3d 1014, 1015 (10th Cir. 2004); Petersen v. Utah Dep't of Corrs., 301 F.3d 1182, 1188 (10th Cir. 2002). Here, Harris has met her prima facie burden. First, Harris engaged in protected opposition. She complained about Hughes' alleged discriminatory conduct in the letter Gardner received between March 15 and 16, 2005. Harris' informal complaint to Gardner, the sole shareholder and president of Crosshaven, qualifies as protected opposition.[3] Hertz, 370 F.3d at 1015 ("Protected opposition can range from filing formal charges to voicing informal complaints to superiors."). Second, Harris suffered an adverse employment action. Gardner terminated Harris on March 29, 2005. Fye v. Okla. Corp. Comm'n, 516 F.3d 1217, 1228 (10th Cir. 2008) ("[T]ermination . . . is clearly an adverse employment action."). Third, a causal connection exists between Harris' letter and her termination. Two weeks elapsed between Gardner's receipt of Harris' letter and her termination. O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1253 (10th Cir. 2001) ("A causal connection may be shown by 'evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.'" (quoting Burrus v. United Tel. Co. of Kan., Inc., 682 F.2d 339, 334 (10th Cir. 1982))). This two-week period is sufficient to establish a causal

---

[3]  Crosshaven intimates, without citation to authority, that Harris' letter does not qualify as protected opposition to any unlawful practice because it "does not ask for any corrective action." Dkt. #35, at 7. The Court disagrees. Harris' letter implicitly requests corrective action because it identifies "issues" which Harris believed deserved Gardner's "immediate attention." Dkt. # 34-3, at 1.

7

connection. See Fye, 516 F.3d at 1228 (holding that a time span of "less than two weeks," alone, is sufficient to establish a causal connection between the protected activity and the plaintiff's termination); Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1202 (10th Cir. 2006) (finding that a period of twenty-four days is sufficient to establish a causal connection); O'Neal, 237 F.3d at 1253  ("[A] one and one-half month period between protected activity and adverse action may, by itself, establish causation." (internal quotation marks and citation omitted)).  The burden shifts to Crosshaven to articulate a legitimate, nondiscriminatory reason for Harris' termination.

### B.  Legitimate, Nondiscriminatory Reason

At this stage, the employer need not rebut evidence presented under the first step.  The employer must rebut only the inference that it acted out of discriminatory animus.  E.E.O.C. v. Flasher Co., Inc., 986 F.2d 1312, 1318 (10th Cir. 1992).  The ultimate burden of proving discrimination remains at all times with plaintiff. Burdine, 450 U.S. at 253.  If the employer carries its burden of production, the presumption of discrimination drops out of the case.  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11 (1993).

Here, Crosshaven has articulated a legitimate, nondiscriminatory reason for its decision to terminate Harris.  Hughes reported to Gardner that Harris "called [her] a lier [sic]."  Dkt. # 30-14, at 1.  In response to Hughes' report, Gardner fired Harris.  Gardner claims that he discharged Harris because her comments constituted insubordination.  The Crosshaven Rules of Conduct prohibit insubordination, misconduct toward and abuse of fellow employees, and commission of acts affecting the efficiency and productivity of other employees. Dkt. # 30-17, at 1-2.  The Rules of Conduct warn that a violation may result in termination.  Id. at 2.  Thus, Harris now must show that Crosshaven's stated nondiscriminatory reason is mere pretext for unlawful retaliation.

## C. Pretext

To show pretext, plaintiff must produce evidence: (1) "that a discriminatory reason more likely motivated the employer," or (2) "that the employer's proffered explanation is unworthy of credence." Jencks, 479 F.3d at 1267. Plaintiff may provide evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997). While "all doubts concerning pretext must be resolved in plaintiff's favor, a plaintiff's allegations alone will not defeat summary judgment." Id. at 1324. "Mere conjecture that the employer's explanation is pretext is insufficient basis to defeat summary judgment." Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir. 1999).

Here, Harris claims that Crosshaven's proffered reason is unworthy of credence. First, Harris argues that her favorable performance evaluation in August 2004 is evidence that "mitigate[s] against the notion that Plaintiff would in any way be insubordinate." Dkt. # 34, at 13. Second, Harris argues that Gardner did not terminate her in good faith because: (i) Gardner did not speak with Harris after he received her March 2005 letter; and (ii) Gardner did not independently investigate Hughes' complaint of insubordination. Id. at 13. Third, Harris argues that Gardner did not terminate her in good faith because Burnett's written statement "as to what happened between Hughes and Harris . . . is completely false and intentionally contrived." Id. at 14. In her affidavit, Harris avers that Burnett could not have witnessed the incident because she was not at work on the day in question. See Dkt. # 34-9, at 1.

9

### 1.  Harris' Performance Evaluation

While "glaring contradictions" between an employee's evaluations and the employer's proffered justification for dismissal may lead to an inference of pretext, Green v. New Mexico, 420 F.3d 1189, 1194 (10th Cir. 2005), this case does not present such a scenario.  Harris legitimately may possess "good people skills," as noted in her August 2004 employment review, Dkt. # 30-4, at 1, and yet still have called Hughes a liar.  Thus, Harris' favorable performance evaluation seven months before her termination does not render defendant's proffered justification implausible.  The Court concludes that this evidence does not support an inference of pretext.

### 2.  Harris' Termination

The Tenth Circuit has held that a pretext challenge requires a court "to look at the facts as they appear[ed] to the person [who] ma[de] the decision to terminate plaintiff." Kendrick, 220 F.3d at 1231.  A court's "role is to prevent intentional discriminatory hiring practices, not to act as a 'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments." Young v. Dillon Cos., Inc., 468 F.3d 1243, 1250 (10th Cir. 2006).  "Even a mistaken belief can be a legitimate, non-pretextual reason for an employment decision." Piercy v. Maketa, 480 F.3d 1192, 1200 (10th Cir. 2007).  The relevant question is not whether defendant's proffered justification is "wise, fair or [even] correct," but whether defendant "honestly believed those reasons and acted in good faith upon those beliefs." Young, 468 F.3d at 1250 (internal quotation marks and citation omitted).

Here, Harris does not dispute that "the incident that led to [her] termination had to do with allegations by Hughes that Harris had asked Hughes to stop lying about her." Dkt. # 34, at 6.  In

fact, Harris does not dispute that a verbal exchange occurred. See Dkt. # 34-2, at 7. Harris claims instead that she did not call Hughes a liar. See id. In her deposition, Harris testified,

> I asked [the tenant] if he made a statement to [Hughes], because [Hughes] told me he made a statement, so I asked [the tenant] about it in [Hughes'] presence because [Hughes and I] were trying . . . to have a better relationship. And [the tenant] denied it, and I stated that I would appreciate [if] any comments, any lies, concerning me would stop.

Dkt. # 34-2, at 7-8. Accepting Harris' testimony as true, the Court finds that Harris' comments could have been perceived as insinuating that either the tenant or Hughes was lying. Whether Harris agrees with (i) Hughes' interpretation of her comments or (ii) Gardner's evaluation of her conduct, is irrelevant. Again, Harris does not dispute that a verbal exchange occurred.

A pretext challenge requires the Court to "look at the facts as they appear[ed] to the person making the decision to terminate, not the aggrieved employee." Piercy, 480 F.3d at 1200 (internal quotation marks and citation omitted). Gardner determined, based on Hughes' allegation, that Harris' behavior violated the Crosshaven Rules of Conduct. Even if Hughes misinterpreted Harris' comments, or if Gardner's reaction to Hughes' allegation was not "wise, fair, or correct," Young, 468 F.3d at 1250, Harris has failed to establish that Gardner did not honestly believe Harris called Hughes a liar. Further, Gardner's proffered justification is not undermined by his failure to conduct independent investigations of Harris' letter and the March 28 incident. The fact that Gardner decided to converse only with Hughes before arriving at his conclusions does not, by itself, show that he did not honestly believe Hughes. Although Gardner's non-exhaustive inquiries may evidence preconceived notions about the trustworthiness of Hughes, as well as poor business judgment, the Court cannot find that this evidence – without more – shows that Gardner's stated reason for Harris' discharge was a "subterfuge for . . . retaliation." Piercy, 480 F.3d at 1202.

The Court notes, sua sponte, that to the extent Harris' arguments may intimate a "subordinate bias" theory of liability, Harris has not raised a genuine issue of material fact with respect to any bad faith by Hughes. The doctrine provides that an employer may be liable for retaliation "if the manager who discharged the plaintiff merely acted as a rubber stamp, or the 'cat's paw,' for a subordinate employee's prejudice, even if the manager lacked discriminatory intent." Kendrick, 220 F.3d at 1231. To prevail under the subordinate bias theory, plaintiff first must establish a genuine issue of material fact concerning the bias of the subordinate. EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles, 450 F.3d 476, 488 (10th Cir. 2006). Plaintiff then must establish a genuine issue of material fact as to whether the proffered justification for the adverse employment decision is pretextual. Id. Under the subordinate bias theory, this requires plaintiff to establish a causal relationship between the subordinate's complaint and the employment decision. Id. "[B]ecause a plaintiff must demonstrate that the actions of the biased subordinate caused the employment action, an employer can avoid liability by conducting an independent investigation of the allegations against an employee." Id. at 488; see Kendrick, 220 F.3d at 1231 (noting the plaintiff's failure to provide any evidence that the employer's investigation was a "sham" or that the subordinate's alleged discriminatory motives influenced the investigation).

As to the first element of the BCI Coca-Cola Bottling test, the Court finds that Harris has "produced sufficient evidence to create a jury question concerning [Hughes'] racial animus." BCI Coca-Cola Bottling Co., 450 F.3d at 489. Fed. R. Civ. P. 56(e)(2) provides that a party may successfully oppose a motion for summary judgment by offering affidavits or other evidence setting forth specific facts. See Ogden v. Farmington Police Dep't, 104 F.3d 368, 1996 WL 700039, at *1 (10th Cir. Dec. 6, 1996) (unpublished decision) (holding that a non-movant may defeat summary

judgment by proffering affidavits or other evidence setting forth "specific facts sufficient to show there is a genuine issue for trial."); Marquez v. Baker Process, Inc., 42 Fed. Appx. 272, 278 n.3 (10th Cir. 2002) (unpublished decision) ("[A] party's testimony by itself may be sufficient to preclude summary judgment, even when the party has also given contradictory testimony." (emphasis in original)).[4]  At the summary judgment stage, courts must accept plaintiffs' specific factual allegations as true and may not make credibility determinations or weigh the evidence.  See Burlington N. & Sante Fe Ry. Co. v. Grant, 505 F.3d 1013, 1022 (10th Cir. 2007) (noting that credibility determinations, the weighing of evidence, and the drawing of legitimate inferences must be done by the factfinder); Nat'l Am. Ins. Co. v. Am. Re-Ins., 358 F.3d 736, 743 (10th Cir. 2004) ("The district court . . . should not determine whether it believes the movant's evidence; rather it must determine whether the nonmovant offered any specific facts that demonstrate the existence of a material fact to be tried.").

Here, Harris supports her claim of bias by offering: (1) her March 2005 letter documenting specific examples of Hughes' alleged discriminatory acts, and (2) her deposition testimony confirming the allegations set forth in the March 2005 letter.  The Court must accept Harris' specific factual allegations as true.  Thus, the Court concludes that Harris has satisfied the first element of the BCI Coca-Cola Bottling test.

Harris has not, however, satisfied the second element of the BCI Coca-Cola Bottling test. Harris has not shown that "[Hughes'] bias translated into discriminatory actions that caused [Harris'] termination."  BCI Coca-Cola Bottling, 450 F.3d at 490.  Harris does not dispute that a verbal

---

[4]   Unpublished decisions are not precedential, but may be cited for their persuasive value.  See Fed. R. App. 32.1: 10th Cir. R. 32.1.

exchange occurred, but instead argues that Hughes misconstrued her comments. See Dkt. # 34-2, at 7-8. The Court finds that "there [is] no reason to believe that racial bias on the part of [Hughes] caused [Harris'] termination," for Hughes reported "nothing but" a legitimate incident to Gardner. BCI Coca-Cola Bottling, 450 F.3d at 492. Even according to Harris' version of the March 28 incident, Hughes could have reasonably and honestly interpreted Harris' comments as a request for Hughes to stop lying about her. The relevant question is not whether Harris agrees with Hughes' interpretation of her comments, but whether Hughes honestly believed Harris called her a liar and acted in good faith upon that belief. Young, 468 F.3d at 1250 (internal quotation marks and citation omitted). Harris provides no evidence that Hughes' "discriminatory . . . actions caused the adverse employment action." BCI Coca-Cola Bottling, 450 F.3d at 487 (emphasis added). Therefore, whether Gardner conducted an "independent investigation" is irrelevant; the record before the Court does not create an inference that Harris' termination was racially discriminatory. Cf. id. at 488, 491-492. The Court concludes, therefore, that Harris' termination does not create a genuine issue of material fact as to pretext.

### 3. Burnett's Written Statement

Similarly, the Court finds that Harris' affidavit does not create a genuine issue of material fact. Harris claims that Gardner acted in bad faith because he relied on Burnett's falsified written statement in making his termination decision. Dkt. # 34, at 13. Harris supports her claim with her affidavit, in which she states "[o]n the date of my termination, [Burnett] was not working and she did not witness my termination or any of the alleged events which led up to my termination." Dkt. # 34-9, at 1. While the Court must accept the allegations in Harris' affidavit as true, Harris offers no evidence, other than her conjecture, that Gardner relied on Burnett's written statement in reaching

his termination decision.  Yet Harris cannot adequately support her claim if "she offers no evidence beyond conjecture and conclusory statements."  Piercy, 480 F.3d at 1202 n.8; see Kendrick, 220 F.3d at 1232 n.11 ("[Plaintiff]'s subjective belief . . . is insufficient to create a genuine issue of material fact concerning [a supervisor]'s allegedly discriminatory motives."); Branson v. Price River Coal Co., 853 F.2d 768, 772 (10th Cir. 1988) ("[P]laintiff['s] mere conjecture that [her] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment.").  Moreover, Harris' conjecture ignores Gardner's testimony that his conversation with Hughes – not the written statements – precipitated his termination decision.  See Dkt. # 34-4, at 10-11.  Gardner testified that he requested the written statements to document the incident.  See id. at 13.

The Court finds that because Harris has not shown that Burnett's written statement had anything to do with her termination, the veracity of Burnett's written statement is not a genuine issue of material fact.  The parties' "conflicting evidence only affects summary judgment if it is relevant to the inquiry."  Piercy, 480 F.3d at 1201.  Harris has offered "no independent evidence, beyond [her] mere conjecture, that would allow a reasonable factfinder to infer" that Burnett's written statement contributed to her termination.  Swackhammer v. Sprint/United Mgmt. Co., 493 F.3d 1160, 1172 (10th Cir. 2007). The Court cannot conclude, therefore, that Crosshaven terminated Harris in violation of Title VII.

**IT IS THEREFORE ORDERED** that Defendant, Crosshaven Properties, Inc.'s, Motion for Summary Judgment (Dkt. # 30) is **granted**.  A separate Judgment is entered herewith.

**DATED** this 28th day of April, 2008.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT